Mark Felding, Consultant Director Feel-Ed, solutions by Rick Oswald. Good afternoon, your honors. May it please the court, Mr. Olmstead. I'm John Ridge, and I represent Pat Ashley and Scott Weifel, and the only defendant left in this case was I.M. Steele and Mark Pozen and others. The only defendant currently is Mark Pozen. Basically, your honor, this came back from remand, and the trial court decided the case and awarded my clients nothing. I think probably the first issue that we went through was the issue that we asked the court if we could amend the case. We wanted to amend that account of fraud because we didn't know early on, and I'm sure the trial court recalls it, but the trial judge in the first go-around decided that it was poor economics as a reason why my clients weren't paid their commissions, etc., and why the businesses failed, and that was reversed. The issue that we discovered was that indeed, Mr. Pozen was the president of all three corporations, I.M. Steele, and GST in Belsen, which went out of business and liquidated under ABC, Assignment for Benefit Accreditors. He basically was the seller and the buyer. That had really been known by your clients for a long time. It had. At trial, the first trial, we knew that. What we didn't know, as I just pointed out, the trial judge said, hey, it's economics that these companies just pulled and went out of business. That's not true. It wasn't economics, and that's what this court found. We did not know to pursue a fraud theory. We did not know the money that had been transferred to Mr. Pozen, and all of this came out at the end. With the fact that he was on both sides of the transaction, as you say, that had been known for a long time. It had. Oh no, not for a long time. It was just never appreciated. Well, it had been known. I really don't know exactly when we realized that. It was probably his answer to interrogatories. But the issue of why pursue a theory if there's no money, we thought indeed there was no money. It was simply a bankrupt situation. There was no money left after creditors were paid off. We had no idea of the way it was handled. We had no idea that the ABCs were indeed simply a tool for Mr. Pozen to transfer all the wealth to his new corporation. So when you say you knew he was a director on both sides, I think that's true. But it wasn't focused on because there was nothing to gain. There was no money there. There was nothing left. That's what was portrayed to us and I believe the trial court the first time around. But the reason I ask that question, based on what the proofs were, this is not a 616C thing to conform to proofs. You're really trying to amend the complaint for a new cause of action with the underlying facts which were known, right? The underlying facts were not known. I mean, the wealth that got transferred, as I say, we thought... But the basis of a fraud claim is his position, isn't it? The basis of a fraud claim was on both sides of the transaction. It is his position, yes. But what I'm saying is we were misled, not as to his position, but as to... Absolutely no unsecured creditor was paid. There was $5.8 million there. Nobody got paid. We didn't know that he got it all. We did not realize that. That was kept secret. That wasn't made known. So, you know, and basically based on that part of it, we asked early on, when we proposed this proposal, we said, well, where are the books and records? And his answer, and I think it's in the file because we went to the court with it, I don't know where they are. The trustee took them. They're destroyed. I don't have them. And then he looks up and he says, all of those are good answers. There are no books and records. So we never got into that aspect of it. We never got the information that would have told us any of this. And all we got was formless deposing. As I understand it, what you're saying is that you didn't pursue this because you didn't think it was a valuable claim, but you still were aware of the underlying circumstances. We were aware he was a director of all of these entities, that he was the president of all of these entities. We had no knowledge that it was of any value. I mean, why put it on? But that's sort of a different question. No, I understand, but that's what I'm saying. We just didn't know. And basically, what was delivered to us prior to trial was, and there's a lot of documents in this case, and I apologize for that, but there was six huge bigger-than-banker boxes delivered to us, just a wealth of papers, and out of that was probably a quarter inch of anything of value. One of those is that exhibit pole. It was just folded in there. We searched for hours to find a couple of pieces of paper here. That's how well it was hidden, and we have never seen the books, the trial balance, any of that. In my client's, for example, there's the commission schedule that you have. It's about that thick. That's from my client's records. As we go through it, both sides utilize that. That's where we set up what he owed us. So the issue... I think we should have been allowed to amend, and we did provide the court with the cases for that, and we have an excuse for not amending earlier. We just had no knowledge it was a viable claim. There is no prejudice to Mr. Pozen. He's the individual who hid all this information. You say you don't have some information. That doesn't correlate to say it was hidden. Well, no, it does, because we asked specifically, and he said, the trustee took it. It's destroyed. I don't have it. He didn't return it. I don't know where it is. Then he gets on the stand, and we go through that part of it with him, and he says, oh, it's kept electronically over at my accountant's. Those were the first words out of his mouth, almost. So yes, he hid it. It was to a point where, what are we going to do? I don't even know if it's over at his accountant's. But the issue is, and as we point out to the court, that if we did amend in this actual or constructive fraud, that's the primary reason there is furtherance of justice. Why is it just that he keeps, I'm going to say $6 million, and we'll go into that, but why is it fair that he keeps that and nobody else gets paid? That's not fair at all. And your honor, as we pointed out to the court, we've given you plenty of examples from Wardell v. Railroad Company, 1880, United States Supreme Court, where they say, hey, if you show us this situation, we'll condemn it. Well, you're right, we knew about it, but we didn't know the magnitude or the value of it. We didn't know what he had done. But when you're considering timeliness, we're considering the underlying facts, not whether or not you thought it was worth it. Well, it's like a, it would have been a waste of time the way it was presented. So it was made that way to us. Presented that way, if you would. Another question on dealing with commissions. Didn't the evidence establish that Baddish is the one who didn't pay the commissions? Who held up the payment of the commissions? There was some testimony on that, yes. But, you know, if you wanted to look at it that way, but I mean, it seems, I have no knowledge that Mr. Posen split this wealth with Mr. Baddish. I mean, everything, nobody got paid, no unsecured creditor, including my clients, received a dime. And that was all the planning here. And as Mr. Posen said, prior to doing this, I met with my attorneys, I met with my accountants, we laid out the plan. And we even commented on that, your honor. If you look at his plan, the assignment for the benefit of creditors, it says in there that the trustee has no liability. Now how can this man be a fiduciary if he has no liability? How is he looking after the unsecured? He's not. He knows what they're going to do, what the plan is, and he doesn't want to be sued. So part of the deal is, I have no liability. Thank you. I think the answer there is if you get three, it would take more than my clients if you would. You would need several to do it. I think you could do that. But again, why would we do that when we're saying, hey, there's not enough money there. I mean, prior, what we did previous to naming Mr. Posen individually was we did sue GST. Just GST. And they didn't bother to show up. We had a default judgment against GST for $127,000 that was this commission. But the ABCs went ahead and we were never paid out of GST. They were insolvent. They came up with a new argument. One of the arguments they came up with was that we don't know if the accounts receivable were ever collected or if anything was received for them. I mean, that's bogus. They received, Mr. Posen bought the uncollected accounts receivable that were left from the trustee that was left over. He paid 99.89% for them. And why not? They're insured. All the accounts receivable were insured. And just to go through in the last couple of minutes, we hear the argument, and this is what has been claimed throughout, that American National Bank never was paid off. The secured creditor had about $9.7 million. It was secured by the buildings and the land and the equipment. But we find out that, and they say, well, we didn't pay the unsecured because we couldn't pay off the secured. But we find out that Mr. Posen paid $1 million the day before the ABCs were executed to the family, to the Bellson stockholders, if you would. I have 30 seconds, and I take it off in five minutes. Thank you. All right, so that's $1 million. That was a preferential payout of $1 million the day prior to the ABC. Then he got credit from the bank for that $1,081,450. Then you consider the inventory, the accounts receivable, the equipment, the business, all the debt that was eliminated, like $15 million in debt, and all of that cost him $822,000. So it's like a 15 or 16 to 1 tradeoff. Obviously, he did quite well. Thank you. Thank you, Mr. Rich. Mr. Olmstead? Thank you. May it please the court. My name is Brent Olmstead, and I represent Mark Posen. I was the only defendant left in this case. This case only asks one real question, and that is, did the trial court address the issues that were remanded back to me? There were six specific issues remanded back to the trial court. This case is not about fraud. There was no fraud. This court found in its decision in the first appeal that the issue of fraud was irrelevant, and the trial court specifically entered a finding in the first order of no fraud. It's not about amending the complaint. The motion to amend the complaint after six years of litigation, trial, judgment, appeal, and remand wasn't close to timely and couldn't meet any of the standards under 616A or C. Those issues aren't what this case is about. What the court's asked to decide in this case is, did Judge Wenzelman look at the order on remand, address the issues that were remanded to him, and issue rulings within his discretion? I think clearly that he did. However, since the issues weren't framed that way by the appellant, I feel constrained to start out with the amendment issue. There are two standards of review. One is an abuse of discretion on the amendment issue, but then there's the manifest way of the evidence, especially about the findings of the trial court. That's true, and courts are constantly mixing up the two, abuse of discretion and manifest way, which I'm not sure about. I appreciate that. There certainly is that component to this case as well. It's whether the trial judge's ruling is free from the legal error that was pointed out in the order remanded, and whether his findings in ultimate judgment were supported by the evidence such that it couldn't be said that no reasonable judge could find what he did. I think clearly that's not the case here, but turning to the issue of amendment first, looking at it in a 616A context, there are four factors to look at. One, does it correct a defect? Two, does it prejudice the other party? Three, is it timely? Four, was there opportunity to amend? The first, there is no defect to correct. There never was a fraud claim. There are so many factual statements that were given to you in the brief and oral argument today that are incorrect. I don't know where to start. There was no million dollar distribution before the assignment for the benefit of creditors. The bank, the secured creditor, refused to continue the line of credit. That's what caused the assignments. Checks were bounced. $650,000 of checks were bounced in one week, and some of those checks were to the plaintiffs. They knew what was happening. What was happening was the secured creditor was forcing the company to make a decision, both companies. The contract was with GST, but Belson and GST were so cross-collateralized that there really was no, from the perspective of creditors, there was no difference between the two companies. So they kind of rolled up together, and that's why the assignments occurred at the same time. The checks were bounced, and the bank told Mark Pozen, either you personally guarantee the debt or the line of credit is over. He wouldn't do that. The line of credit was over, and checks started bouncing. Then the bank chose the assignee. It was not Mark Pozen's choice. It chose Raleigh Capital out of Chicago, Howard B. Samuels, and they came in and started liquidating. The liquidation did not go as expected. So what happened was the notices of the assignments listed assets and liabilities, and ultimately, at the end of the day, for a variety of reasons that I really don't want to go into, but ultimately, at the end of the day, the assets proved to be grossly overvalued in the notice. When the assignments were filed, Mark Pozen thought everybody would get paid, including shareholders. He was a minority shareholder of GST and didn't own any of Belson. Other shares were held by members of his and his wife's family, and they all came away with nothing. That was not expected. Your opponent thinks Pozen came away pretty well. I understand that, but to say Mark Pozen got $6 million is ridiculous. There wasn't $6 million to give to anybody. When all was said and done, Mark Pozen had a debt of $1.9 million, and that was partially satisfied through the new work he had done once the assignment had started for the assignee, and then part of it was cash that he came up with on his own. There was a loan from Cole Taylor Bank for $822,000. He liquidated over $100,000 from his 401k. The reason why Mark Pozen came out of this bad situation, bad for everybody, bad situation, better than the plaintiffs, was because he was able to come up with almost $1 million in capital. And if you can do that... That's what he used to buy the assets? Yes, that and the new work. The auction, we can talk about the auction assets. What counsel's talking about is the auction. The auction was not run by Mark Pozen. The auction was run by Rabin, a well-respected auction company who was chosen by the assignee in the bank. And they chose a date for the auction. The auction occurred, and the auction produced net proceeds much less than what was expected. There were a number of reasons for that. One was the timing of the auction, which was horrible. And Mark Pozen talked to the bank and talked to the assignee and tried to talk them out of it. The auction, believe it or not, was scheduled for September 19 of 2001. September 11 happened. Mark Pozen told them not to go ahead, but they did anyway. It was also Rosh Hashanah, and there's a heavy Jewish presence in the steel industry. So for a number of reasons, he advised them against it. They went ahead. Mark Pozen wasn't the only one there. There were other companies there, too, bidding on the equipment. Sometimes Mark Pozen was the high bidder. But, you know, if Mark Pozen hadn't been there at all, then the net proceeds would have been less. Because we can assume that since Mark Pozen was the high bidder for the equipment that he got, the next bid would have been lower. I don't understand how an open auction like that can be used as the basis to allege some sort of fraud. Certainly Mark Pozen was able to pick up the equipment. He paid a little over $600,000 for the equipment he got. It was not a cash payment. That was applied toward the overall settlement with the bank at the end of the day. June of 2002, there's an agreement signed with the bank. It's Defendant's Exhibit 50. It lays out everything. And at the end of the day, when that settlement agreement was done, GST and Belson still owed over $2 million. And the only asset left was GST's real estate. That was sold later, and the transfer tax records show that the maximum price it could have sold for was $790,000. So at the end of the day, I believe it was $1.6 million that GST and Belson still owed to the secured creditor. American National Bank did not get paid. There was no fact to discover here. There was no late discovery of some groundbreaking fact that would justify amending the complaint at that late date after remand to add a fraud. I disagree with counsel's description of what the discovery was like. The way the discovery went is, when the assignment happened, Mark Pozen and the companies turned over the records to the S&E. The S&E then took over and made decisions. Mark Pozen was still part of the hierarchy. He's still an officer of the corporation. He was still there. He also, on behalf of I.M. Steele, worked to liquidate inventory. But to say that there was some fact out there that was unknown, that there's a tiny little sliver of paper that was valuable, that's not correct. I think you can see defendants' exhibits are two very large notebooks, and most of that came from the bank's records. How did we get the bank's records? Well, the defendants, instigation, produced those documents. The defendants prepared the subpoena du castigum, and it was served, and it was all provided to both parties prior to the trial. And the settlement agreement was in there, and the agreement between I.M. Steele and the S&E for the sale of the inventory was all there. What about those electronic records? I don't think that was Mr. Pozen who said that. I think that was Eric Martel. And it was never developed, and no subpoena was issued, and I have no idea what that means or what those records would be or anything like that. It was extremely frustrating, not only for plaintiffs but for defendants as well, because we issued the defendants again. The plaintiffs never issued subpoenas to anybody. The defendants issued a subpoena to the S&E. But the records we got back were in horrible shape. What had happened was, apparently a rally capital was a two-man operation. It was Howard Samuels and a guy named James Zack. And in between the time the assignments had occurred and the time when the litigation was heating up, Mr. Zack had died. And so he wasn't there, and he was really the person on the ground who knew everything. Howard Samuels put together the documents that he said he had and sent them to us, and they were in there. It was frustrating for both parties. That's part of the reason why the defendant then went ahead and spearheaded an effort to get records from the bank. The bank had much more complete records, but not everything you would hope to see. So there was a deficiency in the record that affected both parties. It wasn't the scheme of Mark Hosan to hide records. That's not what happened. We did everything we could to get the records that we could. But they weren't everything they were hoping to get. In any case, the prejudice to Mark Hosan from an amendment this late date is, it changes the issues, and it expands the relief, potentially. Or maybe not. Frankly, I don't know. If it doesn't expand the relief, then what relevance could it possibly have? Why not an allegation of fraud? The reply brief comes in, and it almost asks for permission to proceed on behalf of all unsecured creditors. That's not what's before the court. What we're talking about here is Pat Ashley and Scott Wakefield and whether they can get relief from Mark Hosan. Previous opportunities to amend it were everywhere. Since 2003, since the third amendment complaint was filed, which by the way, alleged fraud. The third amendment complaint that was filed in 2003 alleged that Mark Hosan did the assignments for the purpose of rolling over business to IM Steele and not paying the plaintiffs. That's the fraud. It was known way back then, that type of theory. It was chosen to not be pursued. But in any case, what this bill is really about are the six remaining issues. The six remaining issues are that there were two analytical issues, and then there were three factual issues, and then there was a tangent issue regarding the definition of employees. The two analytical issues were, first, the ABC, the Assignment for the Benefit of Creditors, does not automatically extinguish a company's responsibility under the Illinois Wage Payment and Collection Act. This court felt that the trial court had held that since the assignment had happened, there were no more obligations, and so there was no liability. I don't think that was the trial court's ruling, but nonetheless, the trial court made clear in the judgment that we're here talking about today that that was not a basis of its ruling, that was not a basis of its rationale. The second analytical issue regarded when commissions accrued under the agreement. This court in the first appeal felt that the trial court held that commissions accrued when paid. That's not correct. I don't think that's what the trial court held the first time, but certainly that's not what the trial court held this time. Under the agreement, commissions accrued when product, ship, accepted by customer, customer pays invoice, money is in GST's hands. That's when the commissions accrued, and the trial court clarified that its decision that's before the court today does not make those errors. Those specific remanded issues are not appealed. There are three factual issues that were remanded that regard specific commissions, but only two were appealed. I've labeled them in my brief as Issues 3, 4, and 5. Issue 3 was United Fixtures and Central Power. Issue 4 is Andreeka Metals and McComb Steel, and Issue 5 has to do with specific commission deductions. The first of those issues that was remanded, United Fixtures and Central Power, isn't mentioned at all in the brief. I think under Rule 341 there's been a waiver, and that's not presented before the court. I don't want to go into it. I guess I can mention them a little bit just to dip, because I think they're a demonstration of the overall problem with these commission issues. The problem relates back to Paragraph 9 of the plaintiff's Third Amendment complaint. Paragraph 9 of the plaintiff's Third Amendment complaint alleges that commissions accrue when the customer is presented and the order goes in. That's what plaintiffs thought in the beginning. That, in fact, was wrong, but that's what they thought, and that framed their evidence at the trial. It made their evidence presentation go so far, but not far enough. The trial judge found your client to be credible. Correct. Go ahead. The trial court made a specific finding that Mr. Pozen was credible, and his test model was believable. Ultimately, the importance of that is that Mark Pozen testified that he didn't knowingly violate an act. The cause of action here is not just wages were owed. Wages were owed to us. Mark Pozen was the president of the corporation. Therefore, Mark Pozen needs to dig into his pocket and pay us our commissions. There's a scienter requirement that's an essential element of that cause of action. In order for a corporate officer to be held individually responsible, he has to knowingly cause the corporation to violate the act. The burden of proof is to show that Mark Pozen knowingly caused the corporation to not pay wages they were owing, and that kind of evidence is completely absent. United Fixtures and Central Power, there really wasn't even any evidence to establish what the amount of the invoice or the commissions would be. And Drieke Metals and McComb Steel suffered from the exact same problem, and Isaac Vadish, the vice president, is the guy who made those decisions. The reduced commissions, those did show that Mark Pozen played some sort of role in those decisions, but they were all related to the agreement. They were all related to the performance under the agreement, and losses that were incurred by GST, and products that were rejected, products that were left on the floor, products that rusted, products that were dirty.  There was no evidence that Mark Pozen is knowingly causing GST to fail to pay commissions that he knows are owing to the players. That kind of evidence was completely absent. Thank you, Your Honor. Thank you, Mr. Robinson. Mr. Rich, you were about. First of all, Your Honors, the statement that was made, and it's in the record, I think I recall that we even got Mr. Pozen, when he testified, we're talking about the million dollars that was distributed to his relatives from Belsen on the day prior to the ABC. That is a fact. That's what he did. That's what he testified to. And no, that is not a mistake I made. That's what happened. And it's in the record. You can find that. He tells us the assets are grossly overvalued. It's gap accounting. He tells us, and nowhere in the record is it that Mr. Pozen paid in a million dollars in capital.  When we went through these, he makes light of the fact that the $6 million we talked about, if you look at what was presented, the only asset schedule we have is what they put together. They had equipment of $5 million. Now, Mr. Pozen purchased most of it. He purchased it for like 12 and a half cents on a dollar. For $628,000, he bought almost everything. I mean, there's very little that was purchased by anybody outside. It was an auction, but I mean, it was a private auction. Advertises a public auction. There were other bidders? I don't know that as a fact. He tells us there were. As I say, look at the ABC, the trustees' agreement, where he incurs no liability no matter what happens. The... So when you add all of this up, $6 million is not... It's well over $6 million. I mean, why would... Are we to believe the bank would take a loss and pay Mr. Pozen on this exhibit, O-1, they paid him $1,081,450. Why would they pay him that and take a loss? The... Why would, if this wasn't a sweetheart deal, they had, I think it's $3.8 million in the combined inventory. They paid Mr. Pozen... First of all, they sold that inventory at 80% of cost, and they paid Mr. Pozen 35% commission to sell it. Where do you get that kind of a deal? Where is that fair to any of the unsecureds? And Pozen's IM Steel bought it. The... There's nothing fair in this transaction. I mean, when you add up these numbers, the million dollars to the relatives, the $1,081,000 he got as credit, the $600,000 he paid for a $5 million inventory, and the $3.8 million in, not inventory, but the equipment, but the $3.8 million that he received in inventory, you know, there's nothing fair. It's well over the $5 million or $6 million that I told this court. The... And we have, we had... Let me give you an example. We had paragraph 12 that the court commented on previously. This is in the agreement that was entered into for commissions, this Exhibit A, and paragraph 12 reads, representatives, and my clients are the representatives, they were the salespeople. Representatives, and they're defined, you know, on the front end as the representatives. Representatives will receive commissions as of July 1, 1999, and Andrika Metals and McComb Steel. They never had a time commission. I mean, that's Mr. Posen signing that contract with my clients. He knew about it. Nobody got paid. He just put it all in his pocket, and there is no, there is absolutely, there is no gross overstatement of numbers. These are the facts. This is what they revealed to us, the little that they did reveal to us. And incidentally, we had, when they, we had, Mr. Posen, we had a request to produce. He refused to sign it. He wouldn't sign it because it was wrong. He didn't produce what he should have produced. We complained to the trial court about his refusal and the little information or no information we got about how he wouldn't answer questions on his, when we deposed him, and that's why they went to the bank to see if they could find some of these records. Thank you, Mr. Rich. Thank you, Judge. And thank you both for your argument today. We will take this matter under advisement, get back to you with a written disposition within a short bit. We now take, well, adjourn for the day and begin again tomorrow morning at 9 o'clock.